IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL B. COHEE,

        Plaintiff,

v.

CARL DANBERG, et al.,

        Defendants.

No. 13-cv-1243-RGA

## **MEMORANDUM OPINION**

Peter S. Murphy (argued), Alexandra D. Rogin (argued), ECKERT SEAMANS CHERIN &
MELLOTT, LLC, Wilmington, DE.

      Attorneys for Plaintiff.

Kenisha L. Ringgold (argued), DEPUTY ATTORNEY GENERAL, DELAWARE
DEPARTMENT OF JUSTICE, Wilmington, DE.

      Attorneys for Defendants Commissioner Carl Danberg, Warden Perry Phelps, Captain
      Marcello Rispoli, Lieutenant Stanley Baynard, Sergeant Raynard Jones, Officer Jason
      Russell, Officer Jamie Mitchell, Officer Della Boone, Sergeant Ernest Kemp, Officer
      James Janusiewicz, and Delaware Department of Correction.

Daniel A. Griffith, (argued), Scott G. Wilcox, WHITEFORD, TAYLOR & PRESTON, LLC,
Wilmington, DE.

      Attorneys for Defendant Correct Care Solutions, LLC.

August 28, 2019



**ANDREWS, U.S. DISTRICT JUDGE:**

On July 17, 2013, proceeding *pro se*, Plaintiff Daniel B. Cohee filed this suit pursuant to 42 U.S.C. § 1983. (D.I. 3). I subsequently appointed counsel to represent Plaintiff, who filed an amended complaint on April 25, 2017. (D.I. 148).

Presently before me are Defendant Correct Care Solutions' ("CCS") Motion for Summary Judgment (D.I. 169) and the Delaware Department of Correction ("the Department"), Commissioner Carl Danberg, Warden Perry Phelps, Capt. Marcello Rispoli, Lt. Stanley Baynard, Sgt. Raynard Jones, Officer Jason Russell, Officer Jamie Mitchell, Officer Della Boone, Sgt. Ernest Kemp, and Officer James Janusiewicz's (collectively, "Department Defendants") Motion for Summary Judgment (D.I. 172). I have reviewed the parties' briefing. (D.I. 170, 173, 177, 178, 183, 186). I heard oral argument on June 28, 2018. (D.I. 190). For the following reasons, both motions are **GRANTED**.

## I.    BACKGROUND

This suit arises out of an incident that occurred while Plaintiff was an inmate at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware. Specifically, the amended complaint alleges that on February 23, 2012, Plaintiff was violently attacked by his cellmate, Pernell Stroman, with a razor blade. (D.I. 148 ¶ 18). Plaintiff lost a substantial amount of blood and received stitches for cuts on both cheeks and a severed tendon in his hand. (*Id.* ¶ 33).

The complaint alleges that, prior to the attack, Plaintiff "repeatedly informed" Defendants Russell, Mitchell, and Doe[1] about his cellmate making threatening and violent statements, and "repeatedly requested" that he or his cellmate be moved. (*Id.* ¶ 19). Plaintiff alleges that the correctional officers ignored his concerns and his request for a transfer. (*Id.* ¶ 21). According to

---

[1] Plaintiff states in the briefing, "[D]iscovery reflects that Officer Doe is likely CO Janusiewicz, as he worked on the tier with, and responded to, the assault with CO Russell and Sgt. Kemp." (D.I. 177 at 8 n.1).

the complaint, Russell and Doe instructed Plaintiff to make his request for a transfer to Defendant Jones. (*Id.*). Plaintiff made a request to Jones on the day of the incident. According to Plaintiff, he said to Jones, "I need to be moved[,] my celly needs to be in the [Special Needs Unit,] he paces all day, rambling on[,] threatening, talking about killing, saying crazy shit, we are having issues, can I be moved?" (D.I. 75; *see also* D.I. 148 ¶¶ 21, 22). Jones replied, "No! I don't move people. The only place I move people is to the Hole. So, if you and your cellmate are having problems, work it out or fight and I'll take both of you to the Hole." (D.I. 148 ¶ 22).

According to the complaint, the attack occurred at approximately 11:50 a.m. and for forty-one minutes Plaintiff fought off his cellmate while trying to get the attention of the correctional officers. (*Id.* ¶ 25). Plaintiff maintains that, although JTVCC policies mandate that officers perform regular visual inspections of inmates every thirty minutes and maintain a "phone punch" log, prison records indicate that officers failed to conduct such an inspection at the required time that day. (*Id.* ¶¶ 25–26). Following the incident, officers locked Plaintiff in a shower room where he "became faint from loss of blood and fell to the ground." (*Id.* ¶¶ 29, 30).

Medical staff, including Dr. Desrosiers, did not reach Plaintiff until approximately 1:00 p.m. (*Id.* ¶ 30). According to the complaint, the medical staff at JTVCC "provided no medical treatment other than wiping Plaintiff's wounds." (*Id.* ¶ 31). Plaintiff was subsequently "shackled to a chair . . . to wait for the ambulance, which arrived at approximately 1:35 p.m." (*Id.*). By that point, Plaintiff had been losing a substantial amount of blood for over one and a half hours. (*Id.* ¶ 32).

The amended complaint asserts seven counts against CCS, the Department, and Department Defendants for violations of the Eighth and Fourteenth Amendments. (D.I. 148). CCS was the medical provider contracted to provide medical services to JTVCC inmates. The

Department is the Delaware Department of Correction. Department Defendants are various

prison officials employed by the Department at JTVCC. Count I alleges that Department

Defendants violated Plaintiff's Eighth Amendment rights through deliberate indifference to a

serious risk of injury or death. (*Id.* ¶¶ 38–42). Count II alleges that Department Defendants

violated Plaintiff's Fourteenth Amendment rights through state-created danger. (*Id.* ¶¶ 43–49).

Count III alleges that the Department and Department Defendants violated Plaintiff's Fourteenth

Amendment rights through failure to train and/or maintenance of wrongful customs, practices,

and policies. (*Id.* ¶¶ 50–56). Count IV alleges that Department Defendants violated Plaintiff's

Eighth Amendment right through the malicious use of force. (*Id.* ¶¶ 57–60). Count V alleges

that Department Defendants violated Plaintiff's Eighth Amendment rights through deliberate

indifference to medical needs. (*Id.* ¶¶ 61–64). Count VI alleges that CCS violated Plaintiff's

Fourteenth Amendment rights through failure to train and/or maintenance of wrongful customs,

practices, and policies. (*Id.* ¶¶ 65–69). Count VII alleges that Defendants Danberg and Phelps

violated Plaintiff's Fourteenth Amendment rights through failure to supervise and monitor CCS.

(*Id.* ¶¶ 70–76).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

### A. CCS' Motion for Summary Judgment on Count VI

Plaintiff's amended complaint asserts one count against CCS, alleging failure to train and/or maintenance of wrongful customs, practices, and policies in violation of the Fourteenth Amendment. (D.I. 148 ¶¶ 65–69). Plaintiff alleges that the wrongful customs and policies

4

maintained by CCS deprived Plaintiff of his constitutional right against cruel and unusual punishment. (*See id.* ¶¶ 68–69).

In support of its motion for summary judgment, CCS raises three principal arguments: (1) Plaintiff failed to exhaust his administrative remedies, (2) Plaintiff has failed to present any evidence that CCS violated his constitutional rights, and (3) Plaintiff has failed to present any evidence that CCS maintained a wrongful custom or policy. (*See* D.I. 170). I agree with CCS on its third argument, and thus will grant summary judgment to CCS on that basis.

To bring a § 1983 claim, Plaintiff "must demonstrate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003).

"When evaluating a claim brought under § 1983, [the Court] must first identify the exact contours of the underlying right said to have been violated in order to determine whether [Plaintiff] has alleged a deprivation of a constitutional right at all." *Id.* at 581 (citation omitted). "If so, the analysis then shifts to a determination of whether the state actor, in this case [CCS],[2] can be held liable for that violation." *Id.*

Even assuming that Plaintiff has provided sufficient evidence on the question of whether CCS employees violated his constitutional rights, I will grant CCS' motion for summary judgment because Plaintiff has failed to present sufficient evidence from which a reasonable jury could find CCS liable for that violation.

For the actions of CCS employees to be attributed to CCS itself, Plaintiff "must provide evidence that there was a relevant [CCS] policy or custom, and that the policy caused the constitutional violation [] allege[d]." *Id.* at 583–84 (citing *Bd. of County Comm'rs of Bryan*

---

[2] There is no dispute that CCS was acting under color of state law in providing medical care to Plaintiff.

*County, Oklahoma v. Brown*, 520 U.S. 387, 404 (1997)). That is because CCS "cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability." *Id.* at 583 (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

"Not all state action rises to the level of a custom or policy." *Id.* at 584. "A policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). A "custom" is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Brown*, 520 U.S. at 404.

Here, Plaintiff has failed to present sufficient facts from which a reasonable jury could find that CCS maintained a wrongful policy or custom that deprived Plaintiff of his right to adequate medical care. The amended complaint alleges that CCS maintained wrongful policies and customs by failing to train and supervise its personnel, failing to administer appropriate medical care, and failing to institute appropriate procedures. (*See* D.I. 148 ¶ 67). There are no facts in the record, however, supporting the allegation that CCS maintained any such wrongful policy or custom.[3]

In arguing that I should not grant summary judgment to CCS on this issue, Plaintiff points to the length of time it took Plaintiff to receive medical treatment for his injuries. (*See* D.I. 178 at 22–23). That CCS employees delayed in reaching Plaintiff is not, in my opinion,

---

[3] Besides the lack of factual support, I do not think Plaintiff has identified a policy or custom. (*See* D.I. 178 at 18–19). Plaintiff's claim is based on a failure of CCS employees to administer appropriate medical care. (D.I. 148 ¶¶ 30–31). Essentially, Plaintiff's argument boils down to, CCS, as a medical provider, maintained a general policy of failing to administer appropriate medical care. But the only evidence for that policy is what CCS did or failed to do in this particular instance.

sufficient to create a genuine dispute of material fact on the question whether CCS maintained a wrongful custom or policy, particularly when there is no other evidence in the record to support Plaintiff's contention in that regard. Plaintiff argues further that I should not grant summary judgment to CCS because it has "refused to produce [relevant] discovery." (*Id.* at 21). Although CCS objected to one of Plaintiff's discovery requests as overly broad, it responded to another by stating that in treating Plaintiff, "Dr. Desrosiers followed her education, training and experience." (*Id.* (quoting Ex. J ¶ 19)). That CCS was unable to identify a more specific policy or custom is not reason to deny its motion for summary judgment.

Absent sufficient evidence from which a reasonable jury could find that CCS maintained a wrongful policy or custom that deprived Plaintiff of his right against cruel and unusual punishment, Plaintiff's § 1983 claim against CCS cannot withstand a motion for summary judgment.

Accordingly, CCS' motion for summary judgment is **GRANTED**.

**B. The Department and Department Defendants' Motion for Summary Judgment**

Plaintiff's amended complaint asserts six counts against the Department and Department Defendants for violations of the Eighth and Fourteenth Amendments. (*See* D.I. 148). I address each of Plaintiff's counts separately.[4]

---

[4] The Department and Department Defendants advance the following five principal bases in support of their motion for summary judgment: (1) Eleventh Amendment immunity, (2) supervisory defendants Danberg, Phelps, and Rispoli cannot be held liable under the principle of *respondeat superior*, (3) Plaintiff's state-created danger claim is barred, (4) there is no evidence of deliberate indifference, and (5) qualified immunity. (*See* D.I. 173). Although I understand the Department and Department Defendants to have moved for summary judgment on all counts of Plaintiff's amended complaint, they do not organize their motion by count. In my opinion, however, it is necessary to analyze each count separately. Accordingly, I address each count in turn, and, where possible, refer to the Department and Department Defendants' relevant arguments.

### 1. Count I

In Count I, Plaintiff alleges that Department Defendants were deliberately indifferent to a serious risk of injury or death to Plaintiff, in violation of his Eighth Amendment right against cruel and unusual punishment. (D.I. 148 ¶¶ 38–42).

"A prison official's 'deliberate indifference' to a substantial risk of harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (citations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

The Supreme Court has "held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious[.]'" *Id.* "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* That means the inmate must show "a pervasive risk of harm to inmates from other prisoners." *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (citation omitted). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." *Id.*

"The second requirement follows from the principle that only unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer*, 511 U.S. at 834. Accordingly, "a prison official must have a sufficiently culpable state of mind." *Id.* "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* That state of mind exists where "the official knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." *Id.* at 838.

The crux of Plaintiff's allegations in Count I seems to be that Defendants Russell, Mitchell, Doe (likely Janusiewicz), and Jones were deliberately indifferent to a substantial risk of harm to Plaintiff by ignoring Plaintiff's concerns regarding his cellmate. (*See* D.I. 148 ¶¶ 38–42). Further, Plaintiff alleges that Jones was deliberately indifferent by instructing Plaintiff and his cellmate, in front of other inmates, to "work it out or fight." (*Id.*; *see also* D.I. 177 at 8–9, 21).

Plaintiff alleges that he "repeatedly rais[ed] his concerns and fears to Russell, Mitchell, Doe, and Jones." (D.I. 148 ¶ 39). First, Plaintiff alleges that on February 18, 2012, he asked Russell and Mitchell if he could be moved to another cell due to problems with Stroman. (D.I. 177 at 4 (citing D.I. 75, Ex. 2 (JTVCC Grievance Form dated March 2, 2012); D.I. 177, Ex. B at 35:14–36:16). Russell said he did not have the authority to move Plaintiff and to ask Jones. (D.I. 75, Ex. 2; D.I. 177, Ex. B at 36:11–16).[5] Second, Plaintiff alleges that, upon his encouragement, Stroman asked Jones if he could be moved to a cell by himself. Plaintiff did not hear what Stroman said to Jones, but knew that Jones denied the request. (D.I. 177, Ex. B at 37:21–38:10). Third, Plaintiff alleges that on February 23, 2012, he told Jones, "I need to be moved[,] my celly needs to be in the [Special Needs Unit,] he paces all day, rambling on[,]

---

[5] In his amended complaint, Plaintiff alleges that both Russell and Doe told him to make his transfer request to Jones. (D.I. 148 ¶ 21).

threatening, talking about killing, saying crazy shit, we are having issues," and Jones told Plaintiff to "work it out or fight." (D.I. 148 ¶ 22; D.I. 177, Ex. B at 38:22–40:3).

Department Defendants argue, "Cohee has presented no evidence to establish that he was housed under circumstances that presented a substantial risk of harm[.] . . . Even the statement attributed to Sgt. Jones does not demonstrate that he actually knew Stroman posed a risk to Plaintiff. There is no evidence that Stroman had [a] pattern [of] violent behavior which would have le[]d any officer to suspect a[n] attack against Plaintiff." (D.I. 173 at 21). They argue also that Plaintiff's claim fails on summary judgment because it is "based upon a single incident." (*Id.* at 19). Plaintiff responds that the record shows that Defendants Russell, Doe, and Jones knew about Plaintiff's concerns regarding his cellmate, which Plaintiff expressed on multiple occasions. (D.I. 177 at 21). He additionally points to the prison log book on the day in question, which shows "that phone punches were not done every thirty minutes, as required by prison policy." (*Id.*).

I agree with Department Defendants that Plaintiff has failed to present sufficient evidence of deliberate indifference to a substantial risk of serious harm.

As an initial matter, Plaintiff fails to point to any facts in the record showing deliberate indifference to a risk of harm to Plaintiff by Defendants Danberg, Phelps, Rispoli, Baynard, Boone, or Kemp. In fact, Plaintiff testified that he never told any of those individuals about his concerns regarding his cellmate. (*See* D.I. 173, Ex. K (Cohee Dep.) at 62:21–63:2, 64:4–9, 67:7–68:1, 70:13–71:3, 96:7–23). Thus, there is no basis in the record for a reasonable jury to conclude that those seven officials were aware of, no less disregarded, a substantial risk of harm posed to Plaintiff by his cellmate.

Viewed in the light most favorable to Plaintiff, the record merely shows that Plaintiff or Stroman expressed concerns to Defendants Russell, Mitchell, Doe, and/or Jones on three occasions, and that correctional officers did not perform phone punches at the required time that day.

Plaintiff points to no evidence showing "the sort of pervasive, longstanding, well-documented risk of harm that is required for [a] violation of the Eighth Amendment." *See Reed v. Harpster*, 2012 WL 2871797, at *5 (M.D. Pa. July 12, 2012) (citing *Riley*, 777 F.2d at 147). That Plaintiff's cellmate was serving a life sentence in a facility for violent offenders does not, alone, establish that Plaintiff was exposed to a longstanding, pervasive risk of harm. And pointing to this single incident is not, in my opinion, enough to demonstrate such a risk. *See Riley*, 777 F.2d at 147. There is no allegation that Stroman had previously ever had any physical altercation with Plaintiff.

Plaintiff also fails provide sufficient evidence that Defendants Russell, Mitchell, Doe and/or Jones had actual knowledge of a serious threat of harm to Plaintiff. Plaintiff identifies three occasions in which officers were informed of his concerns about Stroman. On the first, Plaintiff told Russell, Mitchell, and possibly Doe that he and Stroman were having problems without further detail. (D.I. 75, Ex. 2; D.I. 177, Ex. B at 36:11–16; D.I. 148 ¶ 21). On the second, Plaintiff admits that he could not hear what was said but asserts that Stroman asked Jones if he could be moved. (D.I. 177, Ex. B at 37:21–38:10). On the third, Plaintiff told Jones that Stroman was "threatening" and "talking about killing" but did not identify any specific threats of serious harm. (D.I. 148 ¶ 22; D.I. 177, Ex. B at 38:22–40:3). I do not think allegations of general problems between Plaintiff and Stroman or a single complaint of Stroman generally "threatening" and "talking about killing" is sufficient to show that the officers knew of a

11

substantial risk of harm to Plaintiff such that they were deliberately indifferent to that risk. *See Jones v. Beard*, 145 F. App'x 743, 745 (3d Cir. 2005) (affirming summary judgment of no deliberate indifference to a risk that plaintiff's cellmate would attack him where the record showed that plaintiff told guards that he and his cellmate were not getting along and asked to be moved to a new cell but was "devoid of evidence establishing that [plaintiff] articulated specific threats of serious harm, or that he made multiple complaints about [his cellmate] to any one guard"); *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014) (affirming summary judgment of no deliberate indifference where there was "no longstanding, pervasive, well-documented, or previously noted tensions" between plaintiff and his cellmate and nothing in the record showing plaintiff told defendant "of any specific incident or cause of tension between the cellmates from which a greater inference of risk could be drawn").

Nor can Plaintiff's claim against Defendants Danberg, Phelps, and Rispoli withstand a motion for summary judgment to the extent that it is based on a theory of supervisory liability.

The Third Circuit has recognized "that there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or . . . had knowledge of and acquiesced in their subordinates' violations." *Parkell v. Danberg*, 833 F.3d 313, 331 (3d Cir. 2016) (citation omitted). "Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Chavarriaga v. N.J. Dept. of Corrections*, 806 F.3d 210, 227 (3d Cir. 2015).

"[I]is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). "Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the 'identified deficiency' and the 'ultimate injury.'" *Brown*, 269 F.3d at 216. "Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions." *Sample*, 885 F.2d at 1118. There are, however, "situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk of the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." *Id.*

As to the supervisory defendants, Department Defendants argue, "Plaintiff has not demonstrated that any specific policy or classification process caused or contributed to the assault; or that 'using ordinary common sense' it was . . . foreseeable that Cohee's roommate would attack that day." (D.I. 173 at 16). They argue further, "[T]here is no[] evidence that the Supervisory Defendants knew of any policy [that] placed Plaintiff at risk yet chose to ignore it." (*Id.* at 17).

Plaintiff responds that "there exists a genuine issue of material fact as to [1] whether Defendants Danberg, Phelps, and Rispoli may be liable for allowing the customary practice of failing to conduct cell checks every half hour, in violation of prison policy, or [2] whether [they] . . . had knowledge of and acquiesced to their subordinates' violations of the phone punch log." (D.I. 177 at 15). He points to deficiencies in the correctional officers' performance on the day in question. (*See id.* at 16). He also points to Defendant Russell's testimony that "every day

routines . . . may prevent the [correctional officers] from adhering to the phone punch system every thirty minutes." (*Id.* (citing Ex. A at 11)). Finally, Plaintiff cites a state-commissioned report finding "a systemic failure to consistently implement policies and procedures at JTVCC." (*Id.* at 17).

In my opinion, Plaintiff has failed to present sufficient evidence from which a reasonable jury could find Defendants Danberg, Phelps, and Rispoli liable as supervisors.

That correctional officers failed to perform cell checks every half hour on the day in question and that Russell testified that officers may be prevented from doing so because of certain "routines" at JTVCC, is not sufficient to create a genuine dispute of material fact on the question of whether Danberg, Phelps, and Rispoli maintained a policy, practice, or custom that caused Plaintiff constitutional harm. Further, I find unconvincing Plaintiff's reliance on the 2017 state-commissioned report. Plaintiff cites nothing tying the deficiencies identified in the report to the supervisory defendants. In other words, it is not evidence from which it can be inferred that Danberg, Phelps, or Rispoli "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 138 (3d Cir. 2001) (quoting *Farmer*, 411 U.S. at 846). Nor does Plaintiff cite to evidence showing that the supervisory defendants "failed to adequately respond to a pattern of past occurrences like [Plaintiff's], or [] showing that the risk of constitutionally cognizable harm was so great and so obvious." *Id.* Finally, though there may be a factual dispute on the question of whether the supervisory defendants were aware of their subordinates' violation of the prison's punch log policy, there is no evidence they were aware of and acquiesced in any subordinate's constitutional violations. *See Parkell*, 833 F.3d at 331.

Accordingly, Department Defendants' motion for summary judgment is **GRANTED** as to Count I.

## 2. Count II

In Count II, Plaintiff asserts a Fourteenth Amendment "state-created danger" claim against Department Defendants. (D.I. 148 ¶¶ 43–49).

The "essential elements" of such a claim are: "(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts . . . ; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006); *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). As to the fourth element, "[l]iability . . . is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). Stated differently, "[l]iability requires affirmative state action; mere failure to protect an individual against private violence does not violate the Due Process Clause." *Bright*, 443 F.3d at 284. The issue is "whether state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Id.* at 283 (internal citations and quotation marks omitted).

In my opinion, Plaintiff's state-created danger claim cannot withstand a motion for summary judgment because he is unable to show at least one of the four essential elements. As I understand it, Plaintiff maintains that Department Defendants, namely Russell, Jones, and Mitchell, caused his injuries in three principal ways: (1) by failing to follow policies and

procedures in conducting required visual checks and "phone punches," (2) by ignoring Plaintiff's concerns about his cellmate's mental health, and (3) by encouraging Plaintiff and his cellmate to fight out their differences. (*See* D.I. 148 ¶¶ 44–47; D.I. 177 at 19–20).

Even viewed in the light most favorable to Plaintiff, none of these bases demonstrates a requisite affirmative act by Department Defendants. Indeed, bases (1) and (2) identify supposed inaction by Department Defendants, not action. Although basis (3) is an action, it is not an affirmative act creating danger or otherwise making Plaintiff more vulnerable to danger. I do not think Jones, by stating to Plaintiff that he and his cellmate should "work it out or fight and I'll take both of you to the Hole," used state authority "to create an opportunity that otherwise would not have existed for the third party's crime to occur." *See Bright*, 443 F.3d at 283. Plaintiff's cellmate had the same opportunity to harm Plaintiff regardless of whether Jones made the comment.[6]

Because I find Plaintiff has failed to present sufficient evidence on his state-created danger claim, I will **GRANT** summary judgment to Department Defendants on Count II.

### 3. Count III

In Count III, Plaintiff asserts a failure to train and/or maintenance of wrongful customs, practices, and policies against the Department and Department Defendants, in violation of the Fourteenth Amendment. (D.I. 148 ¶¶ 52–56).

"To establish a Section 1983 claim for failure to train and supervise employees, a plaintiff must (1) identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference and (2) demonstrate a close causal link between the alleged

---

[6] The only reasonable interpretation of Jones' statement is, you have two choices: (1) work it out, or (2) fight and I will punish you. It is not reasonable to interpret the statement as encouraging a fight. It is evident that Jones meant to encourage Plaintiff and his cellmate to "work it out."

failure and the alleged injury." *Daniels v. Delaware*, 120 F. Supp. 2d 411, 423 (D. Del. 2000) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

The "inadequacy of . . . training may serve as the basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [official] . . . come[s] into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference may be established where the need for more or different training is obvious, such as where the failure to train has caused a pattern of [constitutional] violations." *Daniels*, 120 F. Supp. 2d at 423–24.

The crux of Plaintiff's allegations as to Count III seems to be that the Department and Department Defendants failed to train prison officials and staff on JTVCC policies requiring officers to perform regular visual inspections of inmates and maintain a log confirming those inspections. (*See* D.I. 148 ¶¶ 51–52).

The Department and Department Defendants argue that Plaintiff has failed to provide any evidence "that any policy caused an increase in inmate on inmate assaults or that there was any failure [to] provide an adequate medical and security minded response to the assault scene." (D.I. 178 at 17–18).

Plaintiff responds that "it is evident that the phone punch protocol was not strictly adhered to, and Mr. Cohee and his cell mate . . . were encouraged to fight to resolve their differences." (D.I. 177 at 18–19). Plaintiff additionally points to the fact that "witnesses submitted Declarations attesting to the fact that multiple inmates tried desperately, without success, to call for [correctional officers] while Mr. Cohee was in distress." (*Id.* at 19 (citation omitted)). Finally, Plaintiff points to "State commissioned reports regarding safety at JTVCC [finding] that failure to adhere to policies and procedures was a systemic problem within the

prison, running all the way up through the supervisors." (*Id.*). "This indicates that the named supervisory State Defendants were aware of failure to adhere to safety procedures, which resulted in the risk of serious bodily harm suffered by Mr. Cohee." (*Id.* (citation omitted)).

None of the facts in the record identified by Plaintiff show "with particularity what the supervisory officials failed to do that demonstrates deliberate indifference." *See Daniels*, 120 F. Supp. 2d at 423. Rather, Plaintiff points generally to the conduct of specific correctional officers on the day in question or the days leading up to the incident with his cellmate, and a report that broadly discusses deficiencies related to safety, policies, and procedures at the prison. The facts identified by Plaintiff are insufficient to create a genuine dispute of material fact on the question of whether the Department and Department Defendants failed to train employees at JTVCC such that they were deliberately indifferent to the rights of Plaintiff.

The Department and Department Defendants' motion is **GRANTED** as to Count III.

### 4. Count IV

In Count IV, Plaintiff asserts a claim against Department Defendants for malicious use of force under the Eighth Amendment. (D.I. 148 ¶¶ 57–60). He alleges that Department Defendants violated his right against cruel and unusual punishment when they "locked Plaintiff in the shower with his hands handcuffed behind his back immediately after suffering serious, life threatening injuries." (*Id.* ¶ 58).

"In an excessive force claim under the Eighth Amendment, summary judgment in favor of the defendant is appropriate where the evidence, viewed in the light most favorable to the plaintiff, does not support a reliable inference of wantonness in the infliction of pain." *Thomas v. Ferguson*, 361 F. Supp. 2d 435, 438 (D.N.J. 2004) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). The key question is "whether force was applied . . . maliciously and sadistically to

cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Such force is "repugnant to the conscience of mankind." *Whitley*, 475 U.S. at 327. In determining whether force was excessive, courts look to the following factors: (1) "the need for the application of force," (2) "the relationship between the need and the amount of force that was used," (3) "the extent of the injury" inflicted, (4) the threat "reasonably perceived by the responsible officials," and (5) "any efforts made to temper the severity of a forceful response." *Id.* at 321.

As an initial matter, the parties do not specifically address Plaintiff's malicious use of force claim. However, I understand Department Defendants to have moved for summary judgment on all counts. In any event, I find Department Defendants' arguments in regard to deliberate indifference to be relevant in the context of Plaintiff's Eighth Amendment claim for malicious use of force.

As to the facts underlying Count IV, the record shows that when Defendant Russell and other correctional officers arrived at Plaintiff's cell, they saw "blood everywhere." (D.I. 177, Ex. A at 29–30). The officers subsequently shackled Plaintiff to the shower so that they could investigate the incident. (*Id.*). Plaintiff testified that he became unconscious while waiting in the shower for ten to fifteen minutes. (*Id.*, Ex. B at 49).

Even viewed in the light most favorable to Plaintiff, I do not think these facts "support a reliable inference of wantonness in the infliction of pain." *See Thomas*, 361 F. Supp. 2d at 438. At most, the record shows that the correctional officers may have been negligent in shackling Plaintiff to the shower. There is no suggestion, however, that the officers used force maliciously and sadistically, or that shackling Plaintiff was a disproportionate response under the circumstances.

Absent evidence that Department Defendants used force maliciously to cause Plaintiff harm, Plaintiff's claim cannot withstand a motion for summary judgment.

Accordingly, Department Defendants' motion is **GRANTED** as to Count IV.

### 5. Count V

In Count V, Plaintiff asserts a claim of deliberate indifference to medical needs against Department Defendants, pursuant to the Eighth Amendment. (D.I. 148 ¶¶ 61–64).

Under the Eighth Amendment, inmates have a right to receive adequate medical care while incarcerated. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In *Estelle*, the Supreme Court held that prison officials violate an inmate's Eighth Amendment rights when they are deliberately indifferent to the inmate's "serious medical needs." *Id.* at 104. Thus, to establish a claim for deliberate indifference to medical needs, an inmate must allege (1) a serious medical need, and (2) acts or omissions by prison officials indicating deliberate indifference to that need. *Id.* Under Third Circuit law, deliberate indifference in the medical context may be found where "the prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.2d 192, 197 (3d Cir. 1999) (citation omitted).

Plaintiff argues, "A reasonable jury could conclude, based on the evidence, that shackling Mr. Cohee to the shower instead of sending him for medical treatment resulted in delayed access to medical care." (D.I. 177 at 22). Indeed, the record shows that, after arriving at the scene, correctional officers separated Plaintiff and his cellmate, and shackled Plaintiff to the shower. But the record also shows that upon arriving at Plaintiff's cell, the officers at a minimum called a

"Code 8" (*i.e.*, fight between inmates) at 12:31 p.m.[7] and medical staff arrived to treat Plaintiff's injuries by 1:00 p.m. (*See* D.I. 98 at 65).

Viewed in the light most favorable to Plaintiff, I think the record at most shows that correctional officers may have been negligent in shackling Plaintiff to the shower. Although the officers apparently shackled Plaintiff to the shower for a "non-medical reason," the record shows that the officers called a code and, even if it was not a medical code, medical staff arrived soon after. Indeed, as Department Defendants point out, there is no evidence in the record suggesting that the officers attempted to prevent, impede, or delay medical treatment. Rather, they secured Plaintiff away from his cellmate while awaiting medical staff to arrive.

Thus, I find Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that Department Defendants were deliberately indifferent to Plaintiff's serious medical need.

Accordingly, Department Defendants' motion is **GRANTED** as to Count V.

### 6. Count VII

In Count VII, Plaintiff asserts a claim against Defendants Danberg and Phelps for failure to supervise and monitor CCS, in violation of the Fourteenth Amendment. (D.I. 148 ¶¶ 70–76). The crux of his allegations seems to be that Danberg and Phelps knew or should have known of Plaintiff's serious need for medical care, or knew or should have known of CCS' inadequate response to Plaintiff's life-threatening injuries. (*Id.* ¶¶ 72–74). Plaintiff also argues that there is

---

[7] In his brief, Plaintiff notes that the record is unclear as to whether the officers called a "Code 4," (*i.e.*, a medical code). (D.I. 177 at 12). He notes also that Dr. Desrosiers testified, "The only 'Code' that the medical staff respond to is a Code 4." (*Id.* (citation omitted)). In my opinion, whether the officers called a Code 4 ultimately does not make a difference. The record shows that medical staff arrived approximately thirty minutes after the correctional officers arrived at the scene of the incident.

a genuine dispute of material fact regarding whether "the supervisors failed to ensure that Mr. Cohee received prompt, necessary medical care from CCS or other providers." (D.I. 177 at 17).

Again, Plaintiff fails to identify with particularity what Defendants Danberg or Phelps failed to do that demonstrates deliberate indifference, or to demonstrate a connection between that alleged failure and the alleged injury. *See Daniels*, 120 F. Supp. 2d at 423. Although the record, viewed in the light most favorable to Plaintiff, shows that it may have taken longer than usual for medical staff to reach Plaintiff and that the nurses may have misjudged the seriousness of his injuries, Plaintiff ultimately received the medical care he required. He points to no facts suggesting Defendants Danberg or Phelps disregarded an excessive risk to inmate health.

Thus, I do not think Plaintiff has presented sufficient evidence from which a reasonable jury could find Defendants Danberg or Phelps liable under the theory that they failed to adequately supervise CCS. Accordingly, Defendants Danberg and Phelps' motion is **GRANTED** as to Count VII.[8]

## IV. CONCLUSION

A separate order will be entered.

---

[8] Because I conclude that Plaintiff has failed to present sufficient evidence supporting each of the claims asserted against the Department and Department Defendants in his amended complaint, I need not address the Department and Department Defendants' arguments regarding the Eleventh Amendment and qualified immunity. (*See* D.I. 173 at 14, 23–24).